Dew 🔥🔥🔥🔥🔥🔥🔥🔥 🔥🔥 Dews 🔥🔥🔥🔥🔥🔥🔥🔥🔥🔥 Miller's testimony as unreliable and then based on that exclusion, granting a summary judgment on DeWolf or I'll say DB&A. DB&A is misappropriation of trade secrets claim. So there are three potential outcomes here. If this court deems Mr. Miller's testimony reliable, which is what we assert, then the court should vacate the order excluding it and because the court granted summary judgment on the trade secrets claim solely on that basis, then the answer would be to remand and let the trade secrets claim go to the jury. Second, even if the court deems the testimony as to lost profits unreliable, there's another section in that report that goes to unjust enrichment damages. Neither the defendant nor the court complained, found it unreliable, and that under Texas law is an applicable measure for misappropriation of trade secrets. So even if the lost profits analysis is unreliable, we still get to go back to a jury with the unjust enrichment measure. So that's number two. Can you provide a record site to the unredacted information that you contend is a trade secret that's not redacted? I'll answer your question as best I can. There's a lot of information. This is a compilation that DB&A asserts is a trade secret. It's the collection of this information and it's found in two places. It's found in a Salesforce database and it's found in a SharePoint database and so those two items are listed in here. All of that information is not in the record. That's not redacted? Those two? Those two subject matters you're talking about? Pieces of them are, but I mean this is a collection of notes and meeting histories and personal bios and financial information and this and that and so there are there are two records. There's a record and a sealed record and pieces of both of those databases appear in different places. I mean I will be very blunt, it's kind of a mess, but the trade secrets that DB&A asserts are the compilations themselves, the time and effort and money that it took to combine first this customer database and then second the sales and marketing and training materials that they contend underlies this proprietary sales process that they use. So before I get into the weeds, one of two things happened here and when I first read Judge Lindsey's opinion and by the way I would rather be up here saying that anybody other than Judge Lindsey made a mistake because we know he doesn't make many, but everybody misses one every now and then. I'm not sure Judge Lindsey looked at the exhibits. He wrote a very lengthy, very detailed opinion analyzing in this report. The report's 104 pages long, about 55 pages of it are exhibits. Not once in the opinion does he refer to any of the information in the exhibits, but the exhibits are referenced in the report. So when I first looked at it, my first thought was oh my goodness, we messed up and we didn't get the exhibits in the record. We didn't get them in front of the judge. Well we did, but the more I read the opinion, I think that's a possibility that the court just didn't look at the exhibits and I'll explain why that's important in a minute. If he did, assuming he read the whole thing and went through the steps that Mr. Miller lays out in his report, then I think we're looking at a question of law. I think the court here fulfills a scapekeeping role. We've got this constant tension between excluding junk science and preserving the right to a jury trial and as we know the committee messes with Rule 702 mostly I think to chastise courts other than this one who's done pretty well about performing the gatekeeping role, but you've got reliability versus credibility. You've got admissibility versus weight. You've got trial by judge versus trial by jury and of course that's constitutionally guaranteed. So we've got to get the gate in the right place. Getting the gate in the right place is a question of the interpretation of Rule 702. So we're into a question of law territory there. So either this is just a mistake and Judge Lindsey didn't look at the exhibits and again I'll go through those and show why that matters or we've got the gate in the wrong place. And in terms of timing just I think this is important. The motion to strike was filed about three months before the amendments came out. The opinion came out about three months after the amendments came out and so we sort of have a little bit of a moving target. Although the court says this is just to clarify, it's obviously trying to correct a problem and my read is that it messed again with where this gate belongs on the spectrum between judge made law and jury made law. And the reason I say that this is a misinterpretation is again 30,000 foot big picture here. Here we have a gentleman who worked for a company, had access to information, helped contribute to build these databases. He tried to access them even after he left. He continued to work and access information after he'd accepted an offer until he got caught. He goes to another company and within weeks or months he's landed all of these clients that DNA has been working to get. So we've got a very strong circumstantial case that this guy did something wrong. We've got that. We've also got . . . Well, where though is the evidence of the use or disclosure of the allegedly stolen trade secrets? Well, at the PJC in Texas, well, two things. First, you can infer use. So do we have circumstantial evidence? Yes. Do we have Mr. Pethick saying, yes, I did it. I took this information and I used it to contact a client? No, we don't. But there are emails back and forth. There are attempts to access this information after he was no longer employed. There's enough that a jury could reasonably find that this information, these compilations were used and they were used improperly. And again, the PJC focuses on improper means. So it's not just the actual use. It's did you get these or did you know these were obtained wrongfully? So I think the answer to that is twofold. One, I think you can infer use. Two, I'm not sure you have to have it anyway. But against that backdrop of this employee, we've got an expert report. This guy's incredibly qualified. He's got a Ph.D. from the London School of Economics. Defendants do not attack his qualifications. He teaches. He writes. This is what he does all day every day. And we've got a very robust report with calculations laid out. He showed his work. He checked his work. His numbers come in lower than the actual profits that Powers made. We've got these two things. And if the answer really is this doesn't get through the gate, my question is what does? And we just told every innovative business in the country that your secrets aren't safe here because I'm not sure how much better we can do. And so that's why I say if this really is a gate issue, where the gate belongs, then this opinion results from misinterpretation of where it should be. I guess, Ms. Manning, to put a little bit more flesh on this, as I understand what the district court is saying is that this methodology CAPM is not reliable when used to calculate lost profits. Is that a fair summary? That is a fair . . . Okay. So as I understand, so maybe the district court thought, all right, this is used to value stocks. So why should we use it in this context? That's a great question. So stock is equity. CAPM is when you have a company that is equity-based, but you don't have a valuation, is a way to value that company. I mean, either way, what you're valuing is an asset that produces income. So again, this gentleman is uber qualified. Asking him why do you use the CAPM or why do you use the discounted cash flow method, which comes up as well, would be like asking a carpenter, why do you use a hammer? I mean, it's the tool this guy does all day, every day. Why do you ask Barry Bonds why he swings a bat? I mean, these are the tools of his trade. So there's also case law that supports the fact that CAPM has been well accepted by courts. So it's a smart, reasonable, not risky choice to make. So in the absence of something else, you have to use CAPM in order to estimate that part of the discount rate that represents equity. So that's why that comes in. He does break it down, and I gave the court a copy of these exhibits. Again, I'll be real honest, I can't read the numbers as they are in the record, and so I blew these up thinking that it might be easier for the court to follow as well. But if you look, Exhibits 9 and 9.1, it's behind the orange tab. Were these in the record before? Yes, they are in the record. You used them in your argument. Pardon? They were in the district court. They were in the record in the district court, yes. We didn't argue. It was all on submission. That's my understanding. I was not involved in the trial court, but that is my understanding, that there was no hearing. I'm just trying to figure out why you're giving it to us now. Well, they are in the record. This is part of Mr. Miller's report. So this is part of what Judge Lindsey evaluated when he made this decision. What I heard you say was that it was too small or hard to read, and you blew them up a little bit. Is that what she said? Yes. For you, but for me as well. I mean, I used to not think about these things. It's funny how your thoughts change. Anyway, one of the comments that Judge Lindsey makes is that both the cap-in and the complete discount rate are conclusory, that there's nothing behind them to show what Dr. Miller did so that the court can come behind him. Well, Exhibit 9.9 does that. So if you start, this is building up each piece of the discount rate, starting with the risk-free rate, the Treasury rate, and he cites down here for each of these elements his source. I rely on a 30-day average of U.S. Treasury bond. For the next piece, this market risk premium is the difference in the risk-free rate and what you would get in the stock market. There's a very well-established source for that online. He cites that here. He explains his beta, which is the next line. He goes down and adds the fact that he used the cap-in because there is no interest rate associated with DBA because they're not debt-funded, they're equity-funded. And then he goes on and adds the tax rate. So he builds this up, and this line, under the first full solid line, cost of equity, cap-in, and he lays them all out. So this is why I'm saying I'm not sure James Lindsay saw this, because to say it's conclusory and there's no way to go behind it to see if it's correctly calculated, that's exactly what this says, and this is cited in the report. So that was my confusion. But you'll notice also on the left, he does the mathematical, these little red numbers, which line I added to which line to get which answer, and he shows his work, he shows his sources. The different time periods when this report was put forth, the corporate rep for powers had not yet been deposed, so there was some uncertainty about when the date would start, and so he was asked to analyze as of each of these dates, because each of them could be possibilities. And because that risk-free rate changes every day, particularly over periods of time, the numbers change a little bit, and that's why you get the ranges. But again, this is laid out here. The next step that Judge Lindsay kind of struggled with is explained on the next page. It's Exhibit 9.1, and he says, essentially, I don't know where this 14.06 came from. How did you get there? And again, this is laid out. One of the criticisms in the opinion is, well, you used venture capital rates, and this is not a venture capital company. But Dr. Miller explains that in his report. Interestingly, the HOTUS case that's cited in some of the cases, the expert there did the same thing. So this is not new. But you've got an asset, a company over here, you know is well-established, you know is not as risky as some. You've got tons of data on venture capital companies, because they like to talk about what they do, and so there's a lot of data out there. We know that the rate for venture capital companies is about 25 to 50 percent, and he did this over time. It's pretty constant. Because of that, I know this risky group of assets over here, 25 is the least risky. I know mine's less, so I'm going to use that 25 as a cap. Now, I can probably justify a lower discount rate, which would give me a higher value, but I'm going to use the most conservative. I'm going to bump right up against the bottom of that really risky range, and I'm going to use that to calculate my numbers. And so that's what he did. He took the, it's about 25 percent. You can see here on this 9.1, he shows the estimate midpoint, that's that second column of numbers. He goes back and finds the market cost of equity again for that date associated with the study, and sometimes they're in the studies as well. And he says, okay, I know that big discount rate has two pieces. It has the market cost of equity, and it has a risk premium. I'm going to put a risk premium in there to adjust for the fact that there's no guarantee this business is consummated. But again, this is all laid out here. It's sourced, and Judge Lipson's comment that this is conclusory is just puzzling. All right. Thank you, Ms. Manning. Ms. Dearing? Your Honors, good morning. My name is Leah Dearing. I'm here with Ashley Bocot, and we represent the appellees in this case. If it pleases the Court, I would like to begin with an alternative ground for affirming Judge Lindsey's opinion, and that is the appellant's failure to identify the trade secrets at issue that flow through to Dr. Miller's opinion, their failure to demonstrate any use that would be supported under Tutsa, under Texas law. And I think that ties nicely back into why Judge Lindsey ruled the way he did with respect to Dr. Miller's opinion. Your Honors, if you look at the reply brief of the appellants at page 19, they list three categories of information that they say constitute the trade secrets we're here talking about. One is the Salesforce database, which is the compilation of information related to every company that DB&A has ever done business with, or every prospect they've ever added into that database. The second one is a document they call the DOD list. The third thing they list is a compilation, not a compilation, but a series of loose files, loose like just individual files that were found on Mr. Pethick's computer at the time he departed from DB&A. I'd like to start with the second two components, the DOD list and these loose files. Your Honors, if we look at Dr. Miller's report, we will see that Dr. Miller specifically excludes those two categories of information from his analysis. It is uncontested that the only damage analysis we have in this case is Dr. Miller's report. So if Dr. Miller did not rely on the DOD list as part of his causation assumptions informing his opinions, and did not rely on the materials on Mr. Pethick's  Well, okay. It's a little strange because I thought the district court's ruling went to the reliability of the method. You're absolutely right. I understand there's alternative grounds and you can lead with that, but if Dr. Miller's report went to the method of calculating lost profits, then I don't get the leap that we're excluding certain evidence to the argument you're making. I just, I don't understand that. Your Honor, today the question is, did Judge Lindsey have a manifest error in his analysis when he excluded Dr. Miller's report? And further to be manifest error, there must be a complete disregard of controlling law under the Guy v. Crown 2004 opinion from this court. Okay. And Your Honor, I'm perhaps coming at it from the back direction. Well, I mean, yeah, it's kind of a bank shot thing we're doing here. It is, because in the context of this case, it's clear why the opinions that were offered by Dr. Miller are so unreliable. And I can start with the Well, I mean, you can argue whatever you like because, I mean, there is argument about an alternative ground. Judge Smith already referenced it, which was, is there a disputed issue of fact as to whether the trade secrets were actually misused? And you're, you're saying there's also no disputed issue of fact as to whether there are trade secrets? Correct, Your Honor. So the alternative grounds that this court could reach, which frankly I think are pretty easy to get to if the, if they were so inclined, is that there is no allegation supporting the claims that ties together an identified trade secret that was used that can support this damage model. And so if we start, and that's where trade secret cases usually start is what the trade secret is, there's these three categories. But we know Dr. Miller didn't rely on two of the categories. And we know from the briefing that's before the Court of Appeals that DBNA actually doesn't allege any facts to support use of any of the categories. So for example, the DOD list, the record site to support use of the DOD list is to 4094. It's the only record site. It's in two places in the briefing. That record site is argument of counsel at a hearing where counsel for DBNA says he, Mr. Pethick, he took the DOD list. That's the only record site before, Your Honors, to support a use allegation of the DOD list. There isn't even an argument in the briefing that Mr. Pethick used anything that was on his personal laptop. In fact, the record sites before the court show that immediately after he resigned from DBNA, before this litigation was filed, and you'll recall the trade secret misappropriation claim came at the second amended complaint much later. Before the litigation was even instituted, a forensic professional deleted all the DBNA information from his laptop. So there's no allegation or evidence that Mr. Pethick had access to any of this information, but for a few days after his resignation. Your Honor, there's no allegation or evidence in front of the court in any way, shape, or form to the three clients that the Powers Company secured. So Your Honor, that leaves us with the Salesforce database. It's really the only viable thing that is a trade secret in this case. And what do we know about the Salesforce database from the record? We again know that in the reply brief before the court, there's no argument, there's no allegations of use of this data. Now, we just heard from counsel that Mr. Pethick allegedly tried to access the Salesforce database. You recall hearing that just now. The allegation of access attempt, one, they say dispositively in their own briefing that he had been denied access to the database, and so he couldn't access it. But they want to talk about attempted access as some sort of proof that can sustain this claim. What we know from the record and from the testimony in this case is that there was an app on Mr. Pethick's phone, like Facebook or Instagram or one of those apps, and you stay automatically logged in. So when he went to Salesforce on his phone and wanted to update it to access his new employer's systems, it just automatically pinged the DB&A database and he had to update the password and redirect it to the new employer. There's no actual evidence that Mr. Pethick was trying to access DB&A systems intentionally after his employment. In our expert, in Mr. Pethick and Power's expert, Mr. Sinatempo's report, he analyzed the Salesforce database. And Dr. Miller admits in his analysis he didn't look at it. So if we're talking about a trade secret misappropriation claim and the Salesforce database is the foundation of that claim, the only thing, Dr. Miller has never looked at it. He's never analyzed if there's private or public information in it. He just assumes, as he can do as an expert, that it has confidential trade secret information in it that can support this claim. But Mr. Sinatempo didn't. He looked at the Salesforce database and did an analysis and found that the information for the three clients at issue are on Zoom info and LinkedIn. And that those are applications that are already used by the Randall Powers company. Those sites, at the record, are 5217 through 5224. And also in the schedules at 5305 through 5316. Those record sites, if I hear you correctly, those would go to establish that these are not trade secrets because they're not secret? Because it's readily ascertainable information on a public database. Your Honor, in the Guy Carpenter opinion of this court from 2003, that type of readily ascertainable customer information is not subject to protection under the trade secret statute. Also, under this court's opinion in Spear Marketing from 2015, timing alone, the fact that Mr. Pethick interacted at some minute level with these three entities as prospective customers of DB&A during his tenure, and that much later, 6 to 12 to 18 months later, those entities did business with the Powers company, isn't alone insufficient to state a claim for trade secret, Mr. Proctor. I mean, I'm sorry to just state the obvious, but I'm assuming, and I may have the procedure wrong here, but I'm assuming that the grounds for summary judgment were to oversimplify bad methodology on expert, but also no trade secrets and no proof of use or no dispute as to use. Correct. District Court picked door number one. Correct, Your Honor. And you're saying door number two and door number three? Are also wide open and available to walk through, Your Honor. Yes. So, Your Honor, I want to make one more point to the record. In the corporate representative deposition of Jonathan Compton on behalf of DB&A, he testified the only allegation, the only reason they believed that Mr. Pethick had done something improper to support this claim was the suspicious timing. And that testimony is at 2323 and 2349 to 51, Your Honor. So for all these reasons, the summary judgment should be affirmed on these alternative bases, but it demonstrates the lack of foundation of the claim and it ties back in to why the methodology employed by Mr. Miller was improper. First, if you look at the Dr. Miller, uh, Mr. Miller report as a whole, you'll see that, and this was raised also in the briefing below, that the assumptions that form the basis of his causation analysis, and let me take a step back, not analysis, he assumed causation, but he gives a litany of facts that support misuse. They are breach of contract, they're breach of non-compete, breach of non-solicitation, breach of non-disclosure, things that cannot support a trade secret claim. So when you look at his report and you say, this is what Mr. Pethick did wrong, you can't figure out what he's relying on, what causation facts and he . . . Again, forgive the stupid question, but the, um, was the expert offered to prove causation? No, Your Honor. And was, is an expert even necessary to show causation in such a case? Your Honor, the expert is, somebody has to prove causation, Your Honor. Sure, but do you need an expert? I understand why you need an expert to show lost profits, because it's economically complex, but causation, is it necessary? No, Your Honor. The expert is not required to prove causation, but the expert is required to tie their opinions to the facts of the case, and that goes back to the reliability factor that Judge Lindsay ruled on, which is that the methodology is not reliable and was not reliably applied to the facts of this case. Because, and let's just jump forward to that methodology. There's been a lot of talk of math, and that Judge Lindsay didn't do a lot of math in his opinion, and I think that that is the tension between Judge Lindsay's opinion and how the appellants want to present this case. This is not a case about bad math, and this is not a case about lack of, lack of qualification. Okay? Those are different things. This is a case about a lack of reliability in a methodology that's been applied. In a way that just doesn't match the case. So here, we have an opinion where, and I don't want to go too far without making this point on the record. Mr. Miller said in his deposition that he did not do an unjust enrichment analysis. That's at the record at 2888. There is no expert unjust enrichment analysis before this court that it can rely on if it excludes the lost profits analysis. That was an incorrect statement in the opening arguments. So the damage analysis lives and breathes based on the lost profits analysis. Rule 702, as clarified in 2023, but not changed, states that not only does the expert have to be qualified, the opinion has to be reliable and has to be more likely than not under the preponderance of evidence standard. No change to the rule in 2023, just, hey, some courts out there are doing it wrong. Let's make sure they know 104A applies. Easy enough. The commentary, and actually back in 2000, makes it very clear that the court must, not may, not should, must perform a gatekeeping analysis and determine that it is more likely than not that each component is met before an opinion can be put in front of a juror. I can't resist the temptation to tell you that I chaired that advisory committee. Well, I appreciate that. I appreciate the guidance in the notes, and forgive me if I quote them back to you here in a moment, Your Honor. So what Judge Lindsey did is he didn't criticize the math. He never gets to the math, because that is a weight and credibility issue. There was no reason to get to the math. There's a lot of math in here. The issue is, why is this the math? Why, and CAPM, cost-adjusted capital pricing model, very confusing, new concepts to me in this case. It is a discounted cash flow. So all of the evidence in this case suggests that you apply that discount method to capture general market risk. So if I am going to go invest, and I have to make the decision, am I going to invest in this company over here, a startup maybe, or am I going to go invest in a index fund in the stock market, what is the rate of return that I can expect? And there are general market risks out there that you have to account for. COVID is a great example. This case happened during COVID, which is why Mr. Pethick was working from his personal computer at home, right? There's a general market risk that would apply across the board. But here's what's important about that. It's to existing cash flow. This is not a case about existing cash flow. These are prospects on a list of tens of thousands of companies. This isn't valuing DB&A as a going concern. This isn't valuing the Randall Powers company as a going concern and saying, what are the general market conditions that make one of these two companies less profitable in the marketplace? That's not the analysis that's being done. And there are examples, and you see them in the record, where you can use CAPM for lost profits because, for example, a business shuts down. So in one of the cases cited by appellants, CAPM is used for lost profits. And the circumstance was, I think it was a business, a restaurant bar lost its liquor license, and they claimed it had been improperly withheld. So you were able to use a model that measured the business as a going concern because it closed at a certain date, right? So they could look at the historical performance of the restaurant and say, what is the risk it would have continued to perform that well under future market conditions? That's a CAPM model. However, there is no basis that has been provided to us, or in the record, to suggest that that model is appropriate to measure the harm to a company through the use of their trade secrets. We are measuring the harm to DB&A for the purported use of their trade secrets by Mr. Pethick and or the Randall Powers Company. CAPM has never been applied in that circumstance. I guess, again, I'll keep keeping on the dumb questions because this is not my background, but I thought the argument was misuse of the trade secrets causes to lose these three clients, and so we need a model to show, if that is true, what profits we would have gained from getting those clients, and we have to calculate in the risk that we might not have gotten that business. Is that not why the expert used CAPM? Your Honor, that is what they said. Okay, and you're saying that's not reliable, so if you could just fill in the blank, that's not reliable because, fill in the blank. There is no material that suggests it's appropriate to measure that type of risk. There is no experience that has been explained on the record that suggests that anyone has ever done it before. There is no reason to believe it is an appropriate model for this context because it hasn't been tested. There's no way to measure it against another set of data because, for all intents and purposes, it appears this is the first time it's been done, and Your Honor, I will tell you a big distinction between this case . . . In your view, what would have been the standard way of calculating the lost profits in this case? Your Honor, I would go back to the statute, and the statute provides several measures of damages in cases . . . No, but if you need an expert to show it, what should the expert have done that would have been reliable? Your Honor, I might get in a lot of trouble for answering that question. Well, no, I mean you're saying CAPM is not the way. What's . . . Your Honor . . . There's got to be a way to do it. There is a way to do it, and I've litigated cases across this country for almost two decades and not run into this problem. Okay. The problem is . . . How do they usually do it? This case was inappropriate for this model, and the expert couldn't justify why it was appropriate. Okay. Unjust enrichment, if they had done an analysis, might have been an appropriate way to do it. A reasonable royalty rate might have been an appropriate way to do it. But here, where they just said, let's take a look at this case, let's take a look at this model.   Let's take all the revenue with three prospects, not three existing cash flows that relate to . . . I apologize, Your Honor. I see the red light is on. It's inappropriate in this case. I appreciate your time. Thank you. All right. Thank you, Ms. Dearing. Ms. Manning for Rivello? Your Honors, Judge Lincoln, you're exactly right. Any portion . . . any discounted cash flow model has got to have an equity piece. You've got to do that before you can add the other pieces. Here, he used CAPM again. To a financial analyst, this is like a carpenter swinging a hammer. That's what you do. There's case law that supports that other experts have done it, and actually done it this way with using that venture capital lower range as a cap, and that's that HOTIS case. I want to try to hit some of the points that were raised. This apportionment is what I'm going to call it. You didn't tell us which trade secret caused how much of the damage. You have compilations of data, Compilation A for Client A, Compilation B for Client B, C and so on. You have Client A that you stole, you have Client B that you stole, you have Client C. What the defendant is suggesting, and I don't think that it is, that we say, okay, by stealing the name, you made $5, and by stealing the phone number, you made . . . It's not like that. You can't break it down. It is a compilation. I want to turn to the Texas PJC because this is what's going to control. This is what the jury gets asked. First of all, is the compilation a trade secret? This is PJC 111.1. Trade secret means any information, for example, business, scientific, technical, economic or engineering, any formula, design, prototype, pattern, plan, compilation, program device, program code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers. Then there are some caveats. It has to drive independent economic value, and it has to be subject to reasonable means to protect its secrecy. We know these were password protected. That's on the record. That's a fact question. We get to ask a jury, do you believe under these circumstances that this compilation of data qualifies as a trade secret? That's the PJC. Misappropriation . . . You'd be pointing there to the Salesforce compilation? Is that what you're referring to? Salesforce and SharePoint, yes, Your Honor. Second, this use question. This is PJC 111.2. To find misappropriation of a trade secret, you must find the defendant, this first cat, there's a whole list, acquired the trade secret, and the defendant knew or had reason to know that the trade secret was acquired by improper means. We don't even have to get to use. Then it defines improper means, theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy. There's a case law that says an employee can use his general knowledge, but he can't take intellectual property from a prior employer. Of a duty to maintain secrecy to limit use or to prohibit discovery of a trade secret or espionage through electronic or other means. Again, fact question. Under these circumstances, did defendant misappropriate this trade secret? Damages, and I do need to hit this. This is 115.55. I missed something. In that case that talks about the employee can't take information is Sharma v. Venmar. It's 231 Southwest 3rd at 405, and that's what the committee cites. Adjusted enrichment. 155.55 gives two measures, and there can be others, but adjusted enrichment is one of them in particular. The counsel said that there's no analysis on adjusted enrichment. If you look to cite, it's record on appeal 50.59. He specifically says, I did both measures. Paragraph 73 and 74 of Miller's report, 1597.58 is where he lays that out, and interestingly, he relies on powers, P&L. Even without an expert, to your question, the evidence of what was profited at the plaintiff's expense is in the record, and it's in the record as a profit and loss statement as to each of those three clients. It's even segregated, so it's there. Again, the issue here is not whether there's a trade secret. It's not whether there's misappropriation. Those are fact questions, and there's enough evidence in the record to raise those facts. The issue is, was it reliable? Did Dr. Miller, based on his education and his experience, lay all of this out? When you look at that report and you look at the charts behind it, I'm not sure how you come to that conclusion. One more site that you asked for, I didn't have last time, the sort of bad facts that I cited. If you look at record site 3261 to 3268, that's part of the response to summary judgment. It lays out all those facts, and it cites them to the record. Thank you, Ms. Manning. Your case is under submission. Now we need to decide, have we heard from counsel in the Stewart case? Okay. All right, so apparently counsel is not going to be here today, and we apologize to government counsel for having been here, but I think we're not in a position to hear an argument. So court is in recess until 9 o'clock Thursday morning.